UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOVIE DEWDROP LEEN,<br><br>                Plaintiff,<br><br>        v.<br><br>CUEVA, *et al.*,<br><br>                Defendants. | Case No.  2:20-cv-02231-DAD-JDP (PC)<br><br>FINDINGS AND RECOMMENDATION |

Plaintiff Dovie Dewdrop Leen is a state prisoner proceeding without counsel in this civil rights action brought under 42 U.S.C. § 1983.  He alleges an Eighth Amendment sexual assault claim and a First Amendment retaliation claim against defendant Montejo, a physician at the California Medical Facility.  ECF No. 15.  Defendant moves for summary judgment, arguing that plaintiff's evidence is insufficient to create a genuine dispute of material fact for either claim.  ECF No. 42.  I recommend that defendant's motion be granted in part.

**Background**

In his first amended complaint, plaintiff alleges that defendant—his primary care provider ("PCP")—"sexually touched [his] privates" during a physical examination in March 2020.  ECF No. 15 at 7.  He further alleges that, after filing a Prison Rape Elimination Act ("PREA") grievance, defendant retaliated by cutting off his prescription pain medications.  *Id*.  The court found that these allegations stated cognizable claims of sexual assault under the Eighth

1

Amendment and retaliation under the First Amendment, and dismissed plaintiff's claims against all other defendants. ECF Nos. 18 & 20.

Plaintiff suffers from several chronic medical conditions. In his declaration, he describes chronic incontinence, carpal tunnel syndrome, depression, suicidality—including several instances of serious self-harm—and severe spinal conditions that have required multiple surgeries and continue to cause him pain. ECF No. 44 at 6-7. A March 2020 progress note from plaintiff's medical records also indicates that plaintiff has asthma, bilateral foot-drop, chronic low back pain, a history of drug abuse, hepatitis C, hyperlipidemia, major depressive disorder, "superficial metal foreign body," a toe deformity, and unintended weight loss. ECF No. 42-4 at 52-53. In early 2020, defendant was assigned as plaintiff's new PCP, and on March 11, 2020, plaintiff visited him for the first time. ECF No. 42-3 at 73; ECF No. 42-4 at 2.

**A.    March 11 Physical Examination**

In his deposition, plaintiff testified that, during the March 11 visit, he asked defendant why the toes on his right foot were "curled up," and defendant responded that it was due to plaintiff's "injury" and began to examine plaintiff's right foot. *Id.* at 77-78. According to plaintiff's deposition testimony, defendant then began to examine his right lower leg for sensation. *Id.* at 78. Defendant worked his way up plaintiff's leg, feeling the inside and outside of plaintiff's calf with the backside of his outstretched hand and asking, after each touch, "Can you feel this?" or, "Is it numb here?" *Id.* at 78-82. Plaintiff repeatedly answered that his leg was numb and that he could not feel defendant's touches. *Id.* at 81. As defendant worked his way closer to plaintiff's knee, plaintiff began to respond—"some" and, "a little bit." *Id.* Defendant then proceeded past plaintiff's knee, feeling the inside of plaintiff's thigh with the back of his hand but—according to plaintiff—no longer asking whether the area was numb or saying anything to plaintiff. *Id.* Plaintiff stated that, "I didn't say nothing and I just went, like, silent and pulled back some." *Id.* at 78-79, 82. Plaintiff elaborated:

> [Defendant] put his hand, like, in between my thigh and my testicles . . . [and] wiggled it, like, eight to ten times . . . [;] he was trying to, like, touch, like, move it and I was just so scared, like, shocked by his behavior . . . . He pushed and, like, rubbed and pushed at the same time and, like, wiggled his hand in and started

2

> jiggling my privates . . . . He did it about ten times, he jiggled the same spot about ten times, and he looked at me at my face when he did it and I was so scared that I just—I froze. I didn't know what to do. I never had that happen before. . . . After, he sat back and said, "You handled that well."

*Id.* at 82. Plaintiff testified that he responded, "okay," and that defendant abruptly ended the appointment shortly thereafter. *Id.* at 83. He added that defendant touched him through his clothing—pants and underpants—and that he remained fully clothed throughout the appointment. *Id.* at 79-82. He stated that there was no one else in the room, but that there were people just outside the room, less than 10 feet away; he did not indicate whether anyone else was in a position to observe the assault. *Id.*

On March 12, 2020, plaintiff filed a staff complaint—subsequently classified as a PREA complaint—in which he alleged that defendant had touched him inappropriately during the March 11 examination. ECF No. 42-4 at 57, 65, 77; ECF No. 44. In his PREA complaint, plaintiff indicated that he was "molested as a kid and this is what it felt like." ECF No. 42-4 at 57. During a subsequent interview with the prison's PREA compliance manager, plaintiff provided substantially the same account of the March 11 visit. *See* ECF No. 42-4 at 65.

Defendant acknowledges conducting an examination of the sensitivity in plaintiff legs but denies the allegation that he touched plaintiff's genitals. In a declaration included with his motion to dismiss, he states that a neurologic or sensory exam of plaintiff's lower extremities was indicated during the initial visit because plaintiff had presented in a wheelchair and complained of bilateral foot drop. ECF No. 42-4 at 4. Accordingly, he acknowledges that the "physical and neurological examination just described, and beginning at the thigh down, did occur and was documented, and showed that, as to the right leg, Plaintiff had decreased sensation in the left lateral lower leg, and posterior lower leg, areas." *Id.* at 4. However, in response to plaintiff's allegation of inappropriate touching, he attests that he "did nothing of the kind," that he "den[ies] this allegation categorically," and that no "touching of the genital area occurred at all." *Id.* He adds that he "would not, as a physician, make a statement such as the one described" by plaintiff: namely, "[you (plaintiff)] handled it well." *Id.* Similarly, in his earlier interview with the PREA compliance manager, he "denied [plaintiff's] allegation outright" and stated, "'I didn't go that far.

3

1   The examination was routine.'" *Id.* at 67.

2   　　　The medical record includes a progress note from the March 11 visit indicating that

3   plaintiff was experiencing decreased sensation in his lower right leg. *Id.* at 54. The record

4   otherwise contains no apparent documentary evidence of the neurological examination. Neither

5   party has identified any third-party witnesses to the alleged assault. The parties agree that

6   plaintiff remained clothed throughout the examination and that, to the extent any touching

7   occurred, it was through plaintiff's clothing. *See id.* at 4.

8   　　　**B.　　Pain Medication**

9   　　　Plaintiff has a lengthy history of opioid use, both prescribed an illicit. In his declaration,

10   he attests that he has several chronic medical conditions, including severe back problems that

11   have required numerous surgeries. ECF No. 44 at 6. He adds that he has attempted suicide an

12   estimated 18 times because of physical pain, embarrassment stemming from his incontinence, and

13   being treated as a "liar" by prison staff. *Id.* The methods he has used to attempt suicide include

14   cutting his own neck, swallowing razor blades, and taking too many pills. *Id.* at 8. He has

15   intermittently been treated with opioid medications for the pain associated with these conditions

16   including, as relevant here, a course of morphine following a 2018 surgery. ECF No. 42-3 at 58.

17   In his depositions, plaintiff acknowledged that he had also been using illicit heroin since at least

18   2018, in addition to methamphetamine, alcohol, marijuana, and medications had not been

19   prescribed. *Id.* at 43-45, 108. His medical records indicate a known history of drug abuse and of

20   nonadherence to medical treatment. *See* ECF No. 42-4 at 60.

21   　　　In October 2018, plaintiff visited with Dr. Shaw—then his PCP—who informed him of

22   his eventual intent to taper his morphine dose. ECF No. 42-3 at 117. Plaintiff testified that he

23   objected to this plan and filed grievances against Dr. Shaw. *Id.* at 62-63. In 2019, after Dr. Shaw

24   had begun to taper plaintiff's morphine dose, Dr. Dhillon took over as plaintiff's PCP. *Id.* at 67.

25   Plaintiff testified that he and Dr. Dhillon reached an agreement to maintain plaintiff at the current

26   morphine dose—an estimated 7.5 milligrams, three times per day—until he had another surgery;

27   he claims that his dose remained at that level until March 2020. *Id.* at 67-68, 101-04.

28   　　　Plaintiff's medical records partially corroborate this account. In October 2019, Dr.

1    Dhillon reported that plaintiff had tested positive for marijuana and that they discussed the need
2    to "taper off his morphine" and for "counseling against substance abuse." *Id.* at 278. Plaintiff
3    reportedly "request[ed] continuation of morphine . . . [while] awaiting surgery on his back," in
4    response to which Dr. Dhillon wrote that he planned to "discuss[] with [the] chief physician and
5    surgeon before considering taper of morphine." *Id.* Progress notes from November 2019 indicate
6    that plaintiff "agreed to discontinue morphine and start taking methadone . . . for pain control"
7    due to "violation of the narcotics administration policy." *Id.* at 282. Between November 20,
8    2019, and at least January 7, 2020, the medical records list methadone as an active medication;
9    morphine is not listed. *Id.*; ECF No. 42-4 at 60-61. A progress note from the January 7, 2020
10   visit with Dr. Dhillon states that plaintiff "is on pain meds including methadone but is requesting
11   morphine." ECF No. 42-4 at 62. Dr. Dhillon noted that "[p]atient had previously refused urine
12   drug tox screen but is now willing for urine drug tox screen" and that he would "[f]ollow-up after
13   urine drug tox screen to review pain meds." *Id.* Neither party provides records of plaintiff's
14   medication history between January 7, 2020, and March 11, 2020—the date when defendant first
15   met with plaintiff. However, it is undisputed that, as of the March 11 visit, plaintiff was again
16   receiving morphine. *See* ECF No. 42-4 at 2 & 53; ECF No. 42-3 at 67-68.

17          In his deposition, plaintiff testified that defendant began the March 11 visit by remarking
18   "something like, 'You're on a lot of gabapentin,'" and then asking about any problems plaintiff
19   might be having. ECF No. 42-3 at 76-77. Plaintiff purportedly responded that he was in a lot of
20   pain and asked for refills of his medications. *Id.* at 77. According to plaintiff, defendant
21   mentioned that "people that overdose on heroin have always had gabapentin in their system," but
22   he otherwise did not discuss plaintiff's morphine use. *Id.* at 84.

23          Defendant disputes this characterization. He attests that he reviewed with plaintiff the
24   "overwhelming evidence of significant risks" of long-term use of opioids for chronic, non-cancer
25   pain. ECF No. 42-4 at 2. He claims that he noted plaintiff's elevated risk of adverse events both
26   because of the combination of gabapentin and opioids and because of plaintiff's "prior history of
27   substance abuse, dating back at least until early adulthood with multiple episodes of documented
28   diversion of opioids." *Id.*; *see also id.* at 13 (cautioning, in a memorandum from California

Correctional Healthcare Services ("CCHCS"), that "[c]oncomitant gabapentin and opioid exposure was associated with a 49% higher risk of dying from an opioid overdose"). He also claims that he reviewed with plaintiff a "recent drug screen showing him to be using marijuana"—an additional "indication to be tapered off of opioids per [CCHCS] policy and procedures." *Id.* at 2. Because of those risks, he "informed Plaintiff that the plan would be to taper him off opioids," but that he would not initiate the taper just yet. *Id.* at 2-3.

At their second appointment, on May 1, 2020, defendant informed plaintiff that he would begin tapering him off opioid medications. *Id.* at 6.[1] Progress notes from that visit indicate that plaintiff responded by threatening to commit suicide with "a note inside [his] ass" that reads, "I killed myself because [Montejo is] not treating my pain." *Id.* A report of the May 1 visit completed by a witnessing nurse substantially corroborates this account. *See* ECF No. 42-3 at 3, 148. A medical record from January 2020 indicates that plaintiff had previously made similar threats to other medical providers. *Id.* at 150. In his deposition, plaintiff testified that he had never threatened suicide because of a change in his medication, but he acknowledged telling defendant that he had previously attempted suicide because of pain. *Id.* at 137-38. Defendant attests that he relayed to plaintiff reports that he had been diverting morphine; the progress note and nurse's report indicate that plaintiff admitted diverting morphine at least once. *Id.* at 148; ECF No. 42-4 at 6-7, 70.

Defendant attests that, after the visit, he discussed plaintiff's care with his supervising physician and with plaintiff's mental health providers and that he referred plaintiff to the "Institutional Substance Use Disorder Team for consideration of Medication Assisted Treatment [("MAT")]." ECF No. 42-4 at 7. A progress note written by defendant on May 4 indicates that he discussed plaintiff's opioid use with "Dr. DiTomas [Chief Medical Examiner]," who apparently agreed that it was "prudent to initiate taper with the input from psych." ECF No. 42-3 at 156. The record also contains a message to defendant, dated May 5, 2020, from two of

---

[1] Plaintiff testified that the second visit occurred in March, but his description of the visit corresponds with medical records and grievances from early May. *See* ECF No. 43-2 at 99-101; ECF No. 42-4 at 70-72, 76-77.

6

plaintiff's mental health providers, that includes the following: "[w]e will support your decision to titrate this patient off the Morphine," and "we will increase our visits with him, to monitor for signs of anxiety, depression and suicidal or self-harming behaviors." *Id*. at 154.

Defendant had his final visit with plaintiff on May 6, 2020, where he confirmed the plan to taper plaintiff's opioids. ECF No. 42-4 at 7. Thereafter plaintiff received treatment from several other medical providers, who continued to taper his morphine dose until August 9, 2020. ECF No. 42-3 at 101-02, 173 (medication administration record indicating a final prescription order for morphine). His medical records indicate that he continued to receive other pain killers during this time, including gabapentin, ibuprofen, acetaminophen, and at least one Toradol injection for lumbar pain. *Id.* at 175-78, 183. In July 2020, another physician conducted an assessment and determined that plaintiff had severe opioid use disorder, "[c]omplicated by drug-seeking behavior and affective instability." *Id.* at 190. He recommended against plaintiff's participation in an MAT program and counselled plaintiff "to abstain from any opioid-containing drugs including Tylenol with codeine." *Id.* at 191. In his deposition, plaintiff testified that none of his subsequent medical providers have prescribed morphine. *Id.* at 103.

**Legal Standards**

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Washington Mutual Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computs., Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987).

Rule 56 allows a court to grant summary adjudication, also known as partial summary judgment, when there is no genuine issue of material fact as to a claim or a portion of that claim. *See* Fed. R. Civ. P. 56(a); *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim . . . .") (internal quotation marks and citation omitted). The same standards apply to

1 both a motion for summary judgment and a motion for summary adjudication. *See* Fed. R. Civ.
2 P. 56(a), (c); *Mora v. Chem-Tronics*, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

3       Each party's position must be supported by (1) citations to particular portions of materials
4 in the record, including but not limited to depositions, documents, declarations, or discovery; or
5 (2) argument showing either that the materials cited do not establish the presence or absence of a
6 genuine factual dispute or that the opposing party cannot produce admissible evidence to support
7 its position. *See* Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The court may consider
8 materials in the record not cited by the parties, but it is not required to do so. *See* Fed. R. Civ. P.
9 56(c)(3); *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); *see*
10 *also Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010).

11       "The moving party initially bears the burden of proving the absence of a genuine issue of
12 material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the
13 moving party must either produce evidence negating an essential element of the nonmoving
14 party's claim or defense or show that the nonmoving party does not have enough evidence of an
15 essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins.*
16 *Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party meets this
17 initial burden, the burden then shifts to the non-moving party "to designate specific facts
18 demonstrating the existence of genuine issues for trial." *In re Oracle Corp. Sec. Litig.*, 627 F.3d
19 376, 387 (citing *Celotex Corp.*, 477 U.S. at 323). The non-moving party must "show more than
20 the mere existence of a scintilla of evidence." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477
21 U.S. 242, 252 (1986)). However, the non-moving party is not required to establish a material
22 issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to
23 require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec.*
24 *Serv., Inc. v. Pac. Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987).

25       The court must apply standards consistent with Rule 56 to determine whether the moving
26 party has demonstrated there to be no genuine issue of material fact and that judgment is
27 appropriate as a matter of law. *See Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).
28 "[A] court ruling on a motion for summary judgment may not engage in credibility

determinations or the weighing of evidence." *Manley v. Rowley*, 847 F.3d 705, 711 (9th Cir. 2017) (citation omitted). The evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party. *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 772 (9th Cir. 2002); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

**Discussion**

**A.     Sexual Assault**

"Sexual harassment or abuse of an inmate by a corrections officer is a violation of the Eighth Amendment." *Wood v. Beauclair*, 692 F.3d 1041, 1046 (9th Cir. 2012). Eighth Amendment claims are divided into "two components: (1) a 'subjective' inquiry into whether prison staff acted 'with a sufficiently culpable state of mind'; and (2) an 'objective component' that ask[s] whether 'the alleged wrongdoing was objectively harmful enough to establish a constitutional violation.'" *Bearchild v. Cobban*, 947 F.3d 1130, 1140 (9th Cir. 2020) (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)).

In *Bearchild*, the Ninth Circuit laid out three principles of "Eighth Amendment claims arising from sexual assault":

> First, sexual assault serves no valid penological purpose. Second, where an inmate can prove that a prison guard committed a sexual assault, we presume the guard acted maliciously and sadistically for the very purpose of causing harm, and the subjective component of the Eighth Amendment claim is satisfied. Finally, our cases have clearly held that an inmate need not prove that an injury resulted from sexual assault in order to maintain an excessive force claim under the Eighth Amendment. Any sexual assault is objectively "repugnant to the conscience of mankind" and therefore not *de minimis* for Eighth Amendment purposes.

*Id.* at 1144 (quoting *Hudson*, 503 U.S. at 10) (other internal citations omitted). The *Bearchild* court announced that "a prisoner presents a viable Eighth Amendment claim where he or she proves that a prison staff member, acting under color of law and without legitimate penological justification, touched the prisoner in a sexual manner or otherwise engaged in sexual conduct for the staff member's own sexual gratification, or for the purpose of humiliating, degrading, or demeaning the prisoner." *Id*. at 1144. "[W]here the allegation is that a guard's conduct began as

1  an invasive procedure that served a legitimate penological purpose, the prisoner must show that
2  the guard's conduct exceeded the scope of what was required to satisfy whatever institutional
3  concern justified the initiation of the procedure. Such a showing will satisfy the objective and
4  subjective components of an Eighth Amendment claim." *Id.* at 1145.

5  According to plaintiff, defendant touched his genitals inappropriately during a physical
6  exam. ECF No. 42-3 at 76-77. He testified that defendant began by checking the inside and
7  outside of his right lower leg for sensation before proceeding to move his hand up the inside of
8  plaintiff's thigh, inserting his hand between plaintiff's thigh and genitals, and "wiggl[ing]" his
9  hand back and forth "eight to ten times." *Id.* at 82. Although defendant repeatedly asked whether
10 plaintiff could feel his touches during the first part of the exam, he was purportedly silent while
11 touching plaintiff's inner thigh and genitals. *Id.* Plaintiff contends that defendant then "sat back
12 and said, 'You handled that well.'" *Id.* at 82. Defendant acknowledges that the exam took place
13 but attests that no "touching of the genital area occurred at all." ECF No. 42-4 at 4. He disputes
14 stating that plaintiff "handled that well," stating that he "would not, as a physician, make a
15 statement such as the one described." *Id.* Beyond their own testimony, neither party has
16 produced significant documentary evidence or third party witnesses to support or refute plaintiff's
17 allegations. Thus, there is a genuine dispute as to whether defendant touched plaintiff's genitals
18 in the manner described by plaintiff during the March 11 medical visit. *See Rodriguez v.*
19 *Airborne Express*, 265 F.3d 890, 902 (9th Cir. 2001) ("[S]elf-serving affidavits are cognizable to
20 establish a genuine issue of material fact so long as they state facts based on personal knowledge
21 and are not too conclusory.").

22 Defendant argues that plaintiff has not shown the absence of a legitimate penological
23 justification, because plaintiff's "neurological complaints made [a] full neurological exam,
24 including sensory exam, appropriate." ECF No. 42-1 at 10. But plaintiff nowhere argues that the
25 entire sensory examination was inappropriate; he contends that defendant sexually assaulted him
26 during an otherwise normal examination. Defendant's own statements arguably suggest that
27 touching plaintiff's genitals was not a legitimate part of any medically indicated sensory exam.
28 In his interview with the PREA compliance manager, he stated that he "'didn't go that far'" and

that "'[t]he examination was routine,'" implying that it would not have been routine to touch plaintiff's genitals in the manner described by plaintiff. ECF No. 42-4 at 67. Plaintiff's testimony is therefore sufficient to raise a genuine dispute of material fact as to whether defendant's "conduct exceeded the scope of what was required to satisfy whatever institutional concern justified the initiation of the procedure." *Bearchild*, 947 F.3d at 1145. As the Ninth Circuit has explained, such a showing satisfies "the objective and subjective components of an Eighth Amendment claim." *Id.*; *see Country Stevens v. Ward*, 3:17-cv-00093-MMD-WGC, 2019 WL 3069866, at *3 (D. Nev. June 25, 2019), *report and recommendation adopted*, 2019 WL 3068445 (D. Nev. July 12, 2019) (denying summary judgment on Eighth Amendment sexual assault claim to a defendant prison physician who allegedly "put his finger too far inside of [the p]laintiff's rectum during the prostate portion of [a hernia] exam").[2]

### B. Retaliation

Plaintiff claims that defendant retaliated against him for filing a PREA grievance by discontinuing his morphine prescription. "It is well-established that, among the rights they retain, prisoners have a First Amendment right to file prison grievances . . . [, and r]etaliation against prisoners for their exercise of this right is itself a constitutional violation." *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009) (citations omitted). A claim of retaliation under the First Amendment has five elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

As an initial matter, there is no dispute that plaintiff filed a PREA grievance against defendant following the March 11 medical visit, or that filing such a grievance constitutes

---

[2] Defendant also argues that "even though no touching of the genital area actually occurred . . . , it would have been appropriate under the circumstances," because plaintiff had also been complaining of incontinence. ECF No. 42-1 at 10. To the extent defendant is taking the position that his alleged conduct was appropriate, he fails to explain how wiggling his hand back and forth between plaintiff's inner thigh and genitals constitutes a legitimate treatment or evaluation technique for incontinence.

11

1    protected conduct under the First Amendment.  *See* ECF No. 42-2 at 5 (noting that plaintiff's

2    filing of a grievance is undisputed); *Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995) ("[A]

3    prisoner's fundamental right of access to the courts hinges on his ability to access the prison

4    grievance system.").  Neither does defendant dispute that he initiated a "taper of plaintiff's opioid

5    medication," which would constitute an adverse action if undertaken for retaliatory reasons.  ECF

6    No. 42-4 at 7; *see Tomel v. Hawaii*, 570 F. App'x 717, 719 (9th Cir. 2014) (holding that the

7    plaintiff adequately pled an adverse action with allegations that the defendant "refused to provide

8    medication").  Rather, defendant argues that the court should enter summary judgment in his

9    favor because he discontinued plaintiff's medication for non-retaliatory medical reasons and in

10   service of legitimate correctional goals.  ECF No. 42-1 at 12-14.

11           To prove the second element—variously referred to as causation or retaliatory motive—

12   plaintiff must show that his protected conduct was "the 'substantial' or 'motivating' factor behind

13   []defendant's conduct."  *Brodheim*, 584 F.3d at 1271 (*Soranno's Gasco, Inc. v. Morgan*, 874 F.2d

14   1310, 1314 (9th Cir. 1989)).  Although suspect "timing can properly be considered as

15   circumstantial evidence of retaliatory intent," timing alone is typically insufficient to survive

16   summary judgment.  *Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995) (reversing a denial of

17   summary judgment where the district court relied solely on the timing of the plaintiff's protected

18   conduct and an allegedly retaliatory transfer).  In addition to timing, the court considers the nature

19   of the allegedly retaliatory action, the defendant's knowledge of the protected conduct, and any

20   other statements or conduct by the defendant.  *Id.*

21           Defendant does not dispute that he knew of plaintiff's PREA grievance before beginning

22   to taper plaintiff's opioid medications.  ECF No. 42-4 at 6.  However, as in *Pratt*, "there is little

23   else to support [an] inference" of retaliation.  65 F.3d at 808.  Plaintiff identifies no direct

24   evidence, such as statements or notations made by defendant, that defendant was motivated by

25   retaliatory animus.

26           Conversely, defendant proffers legitimate non-retaliatory reasons for tapering plaintiff off

27   opioid medications, and he contends that he "informed Plaintiff that the plan would be to taper

28   him off opioids" on their first visit—before plaintiff filed the PREA grievance.  ECF No. 42-4 at

2; 42-1 at 5. Defendant argues that his decision to taper plaintiff's opioid medications was based on plaintiff's significant history of drug abuse, drug-seeking behavior, diversion of medications, and an "unexplained level of disability inconsistent with his current medical or disease process." ECF No. 42-4 at 7. He contends that he addressed plaintiff's problematic use of both opioids and gabapentin during the first visit, and that he identified CCHCS guidelines warning that "[c]oncomitant gabapentin and opioid exposure [is] associated with a 49% higher risk of dying from an opioid overdose." *Id.* at 2 & 13. Plaintiff admitted that he was using illicit heroin and other drugs before the March 11 visit, that he had diverted his morphine on at least one prior occasion, and that he had tested positive for marijuana—an "indication to be tapered off of opioids per [CCHCS] policy and procedures." *Id.* at 2; ECF No. 42-3 at 43-45, 108, 148. Plaintiff describes the March 11 visit differently—as involving only a brief discussion of his morphine and gabapentin use—but does not dispute that defendant raised the issue. *See* ECF No. 42-3 at 76-77, 84. The record is replete with examples of plaintiff threatening self-harm in response to discussions of tapering or discontinuing his opioids, including in his own submissions to this court. *See* ECF No. 42-3 at 3, 148, 150.

Defendant further argues, and the record supports, that plaintiff's mental health care providers and supervising medical officials supported his decision to taper plaintiff's opioids, and that he referred plaintiff to other services, including MAT and additional mental health services, to mitigate the challenges of discontinuing opioids. ECF No. 42-4 at 7; ECF No. 42-3 at 154-56. The record indicates that plaintiff's prior physicians had also attempted to taper his opioids, and that subsequent medical providers have consistently agreed with defendant's decision. *See* ECF No. 42-3 at 101-03, 173, 190. Plaintiff argues that he had an agreement with Dr. Dhillon—his prior PCP—to maintain his level of opioid medication until receiving an additional spine surgery. *Id.* at 67-68, 101-04. The record admits some ambiguity regarding plaintiff's opioid use in late 2019 and early 2020, and neither party disputes that plaintiff was still receiving opioids in March 2020, but plaintiff provides little evidence either of his purported agreement with Dr. Dhillon or that defendant knew of such an agreement. *See id.* at 67-68, 278-82. Apart from vague allegations about his level of pain, plaintiff provides little competent evidence that opioid

medication was medically necessary and does little to refute defendant's arguments that discontinuing his use of opioids was medically indicated and furthered legitimate correctional goals.

In the absence of direct evidence of retaliatory animus, and in light of robust evidence that defendant would have tapered plaintiff's opioids whether or not plaintiff had filed his PREA grievance, I find that plaintiff has not raised a genuine dispute of material fact. *See O'Brien v. Saha*, No. 19-CV-1957-JLS (JLB), 2021 WL 960693, at *10 (S.D. Cal. Mar. 15, 2021) (granting summary judgment to defendants where "no jury could find on the present record that Defendants were not motivated by a legitimate penological interest in tapering Plaintiff off his gabapentin prescription"); *Miller v. California Dep't of Corr. & Rehab.*, No. 16-CV-02431-EMC, 2018 WL 534306, at *16 (N.D. Cal. Jan. 24, 2018) (finding for defendants where, even if the tapering of the plaintiff's pain medication occurred after the alleged protected activity, the plaintiff failed to adequately "dispute [the] Defendants' evidence that the reduction and eventual elimination of the morphine reasonably advanced legitimate medical goals"). Accordingly, I will grant summary judgment for defendants on plaintiff's retaliation claim.[3]

### C. Qualified Immunity

Regarding plaintiff's sexual assault claim, defendant argues in the alternative that he is entitled to qualified immunity. To assess whether qualified immunity attaches, a court asks "two questions: (1) whether the facts, taken in the light most favorable to the non-moving party, show that the official's conduct violated a constitutional right, and (2) whether the law at the time of the challenged conduct clearly established that the conduct was unlawful." *Felarca v. Birgeneau*, 891 F.3d 809, 815 (9th Cir. 2018). An "official's conduct violates clearly established law when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "While there does not have to be a case directly on point, existing precedent must place the

---

[3] Because I find for defendant on the merits of this claim, I need not and do not reach defendant's qualified immunity defense to plaintiff's retaliation claim.

1   lawfulness of the particular [action] beyond debate." *City of Escondido v. Emmons*, 139 S. Ct.
2   500, 504 (2019). "This is not to say that an official action is protected by qualified immunity
3   unless the very action in question has previously been held unlawful; but it is to say that in the
4   light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739
5   (2002) (citations omitted); *see also Taylor v. Riojas*, 141 S. Ct. 52, 53-54 (2020) ("'[A] general
6   constitutional rule already identified in the decisional law may apply with obvious clarity to the
7   specific conduct in question.'") (quoting *Hope*, 536 U.S. at 741).

8       Having addressed the first question above, I turn to whether the right at issue was clearly
9   established. "[T]he right allegedly violated must be defined at the appropriate level of specificity
10  before a court can determine if it was clearly established." *Gordon v. Cnty. of Orange*, 6 F.4th
11  961, 969 (9th Cir. 2021) (internal citations omitted). In defining the right, courts must be mindful
12  that "casting an allegedly violated right too particularly, 'would be to allow the instant
13  defendants, and future defendants, to define away all potential claims.'" *Id.* (quoting *Kelley v.*
14  *Borg*, 60 F.3d 664, 667 (9th Cir. 1995)). Viewing the facts in the light most favorable to plaintiff,
15  defendant "rubbed and pushed" and "jiggled" plaintiff's genitals through his clothes eight to ten
16  times while performing an examination that would not ordinarily require defendant to touch
17  plaintiff's genitals. ECF No. 43-3 at 82. Rather than providing a legitimate medical or
18  penological interest for touching plaintiff's genitals, defendant disputes that any such contact
19  occurred. His suggestions that either a sensory exam or an evaluation of plaintiff's reported
20  incontinence amounts to a legitimate medical reason to touch plaintiff's genitals does not
21  withstand scrutiny. *See supra*, page 9-11.

22      In *Bearchild v. Coban*—decided in January 2020, before the events at issue—a prisoner-
23  plaintiff had accused a correctional officer of sexually assaulting him during a pat-down search
24  by "rubbing, stroking, squeezing, and groping [his] intimate areas" through his clothes, ordering
25  him to "pull his waistband away from his body, star[ing] at his penis, and ask[ing], "Is that all of
26  you?" 947 F.3d at 1135. On appeal, plaintiff contested a jury instruction that had directed the
27  jury to consider "the extent of the injury" he had suffered, the "need to use force," and the
28  "relationship between the need to use force and the amount of force used." *Id.* at 1145-46.

Holding that the instruction was plain error and prejudicial to the plaintiff, the Ninth Circuit "emphatically rejected [the] notion" that "some forms of sexual assault may be *de minimis*" and "reaffirm[ed] . . . that sexual assault violates the Eighth Amendment regardless of the amount of force used." *Id.* at 1146. Thus, at the time of the events in question, it was clearly established that a prison official violates the Eighth Amendment when he gropes a prisoner's genitals through his clothes without a legitimate justification or in excess of an initial justification for some physical contact. Defendant is not entitled to qualified immunity.

Accordingly, it is hereby RECOMMENDED that defendant's motion for summary judgment, ECF No. 42, be granted as to plaintiff's retaliation claim and denied as to plaintiff's sexual assault claim.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   November 28, 2023

JEREMY D. PETERSON
UNITED STATES MAGISTRATE JUDGE